NANCY A. NOLETTE
Plaintiff *in pro se*
216 Bighorn Drive, Unit 1
Boulder City, NV 89005
702-293-7077

2012 AUG -9 P 1: 19

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

NANCY A. NOLETTE, *in pro se* and DOES 1-10

Plaintiffs,

vs.

ROGER TOBLER, CAM WALKER, DUNCAN MCCOY, DAVID OLSEN, all in their official and individual capacities; and the CITY OF BOULDER CITY

Defendants

2:12-cv-01414-JCM -PAL

CIVIL RIGHTS COMPLAINT PURSUANT TO 42 U.S.C. §§ 1983, 1988

**JURY DEMAND**

The plaintiff, Nancy A. Nolette, moves the Court for entry of judgment in her favor against Roger Tobler, Cam Walker, Duncan McCoy, David Olsen, and the City of Boulder City, and in support of such Complaint avers as follows:

## JURISDICTION

1. This is a civil action under 42 U.S.C § 1983 seeking damages and injunctive relief against Defendants for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiff of rights secured under the Constitution and laws of the United States; obstructing and retaliating against Plaintiff for her exercise of constitutionally protected speech and reserved powers of direct legislation; and for refusing or neglecting to prevent such deprivations and denials to Plaintiff.

2. This case arises under the United States Constitution and 42 U.S.C. Section 1983 as amended. This Court has jurisdiction in this matter pursuant to 28 U.S.C. Sections 1331 and 1343. The declaratory and injunctive relief sought is authorized by 28 U.S.C. Sections 2201 and 2202, 42 U.S.C. Section 1983 and Rule 57 of the Federal Rules of Civil Procedure.

3. Plaintiff brings this action resulting from damages incurred due to her unlawful denial of her first amendment rights to submit initiative petitions in a series of events commencing in January 2010 and ongoing to this date. Plaintiff was wrongfully sued for circulating initiative petitions for the City of Boulder City in violation of her federal and state constitutional rights of free speech and reserved powers and rights of direct legislation, and other rights protecting her under Nevada law and local law.

4. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. 1391(b)(1) and (b)(2). The actions complained of took place in this judicial district; evidence and official records relevant to the allegations are maintained in this judicial district; Ms.Nolette would be free to exercise political speech intended for the betterment of citizens in this judicial district and exercise reserved power of Nevada citizens to directly set policy through initiatives

but for the unlawful actions and practices of the Defendants; and the Defendant public officials and City of Boulder City are present and regularly conduct affairs in this judicial district.

## PARTIES

5. Plaintiff Nancy A. Nolette ("Nolette") is a retiree currently residing in Boulder City, Nevada.

6. Roger Tobler ("Tobler") is Mayor of Boulder City. He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

7. Cam Walker ("Walker") is a Councilman for Boulder City. He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

8. Duncan McCoy ("McCoy") is a Councilman for Boulder City. He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

9. Dave Olsen ("Olsen") is the appointed City Attorney for Boulder City. He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

10. Defendant City of Boulder City is an incorporated city under Nevada Revised States, a political subdivision of the State of Nevada, and a "person" subject to suit within the meaning of 42 U.S.C. Section 1983. It is vested among other things with protecting citizens' rights, including political rights to circulate initiative petitions under Nevada and local law. It is sued for declaratory and injunctive relief.

11. At all relevant times, Defendants acted under color of state law.

**COMPLAINT**

12. Boulder City was originally established by the federal government for the construction of Hoover Dam in the early 1930s. In 1958 Congress passed the Boulder City Act (Public Law 85-900, 72 Stat. 1726), disposing of federal government ownership of most of the real property within the city.

13. In 1959 a committee of Boulder City residents prepared a draft of a Charter for incorporation under Nevada law. On September 29, 1959, at a special election, the electors approved the Charter with 745 votes for and 167 votes against.

14. The Charter, since amended by the voters on numerous occasions, contains provisions unique in Nevada reflecting the values shared by residents.

15. One such value is citizen involvement, as evidenced by the large amount of political power reserved by the citizens concerning certain types of important city decisions. Such decisions must be approved by the electors. The number of types of occasions requiring a popular vote by the Charter are believed to exceed those of all other incorporated cities or counties in Nevada. That number has only increased over the years.

16. Another popular value is an aversion to uncontrolled growth, as provided for in Charter Section 140.1.A, requiring voter approval of most land sales of more than one acre. This provision is an amendment to the Charter, added by voter initiative in 1997.

17. The same aversion to uncontrolled growth is also expressly stated in Title XI, Chapter 41 of the Boulder City Code, commonly known as the Controlled Growth Ordinance. The Controlled Growth Ordinance was also enacted by voter initiative in 1979, and subsequently amended with voter approval in 1996.

**Initial Acts Establishing an Unlawful City Policy**

18. In 1995 Boulder City purchased the Eldorado Valley Transfer Area (hereinafter, "Transfer Area") of 107,412 acres indirectly from the federal Bureau of Land Management, increasing the total city area to about 200 square miles.

19. Voters had previously approved expenditures from the Capital Improvement Fund for this purchase in 1991, as required by Charter Section 143.

20. The purposes stated in the Transfer Agreement for the city's land purchase was to preserve desert tortoise habitat, provide areas for public recreation, and provide other areas for solar energy development.

21. Although unstated in the Transfer Agreement, but consistent with the residents' aversion to uncontrolled growth, is the highly important purpose of the creation of a buffer zone between Boulder City and the explosive growth of the population of large nearby communities in Clark County. Incorporation of the largely undeveloped land of the Transfer Area provides that buffer to a substantial, if imperfect, degree.

22. However, the City Council acted subsequently in manners inconsistent with both the stated and unstated purposes of the purchase, *e.g.* a proposed landfill (1996); a lease for a gravel pit (1996); a gas-fired power plant (1997); and proposals of land leases for commercial use (2002).

23. As a consequence, again by citizen initiative, voters added in 1998 a new Section 144 to the Charter. This expressly limits the uses of the Transfer Area to public recreation, solar energy facilities, a desert tortoise preserve, utility lines, easements, roads, rights-of-way, communication towers, antennas and similar governmental uses, and for existing lease and lease options. Any other use requires voter approval.

24. Included in the Transfer Area is an area of about 1,500 acres known as Dutchman Pass. This undeveloped but very scenic area is within the McCulloch Mountain range.

25. In early 2004 and again in 2005 then Boulder City Councilman Michael Pacini proposed that Boulder City sell Dutchman Pass for home development. Such a sale requires voter approval under Charter Sections 140.1.A and 144.

26. In the State of the City address in 2006, then Mayor Robert Ferraro proposed that Boulder City sell Dutchman Pass to fund a proposed new highway. Such a sale requires voter approval under Charter Sections 140.1.A and 144.

27. In October 2005 Lawrence Canarelli, a real estate developer not residing in Boulder City, approached the City Council with a proposal to develop 3,800 high density homes on a parcel of privately held 640 acres within the Eldorado Valley but just outside of city limits. In the course of subsequent negotiations, this became a proposal for a three-way exchange of Mr. Canarelli's property, the Dutchman Pass parcel, and other land owned by the BLM. Such a disposition requires voter approval under Charter Sections 140.1.A and 144.

28. On February 14, 2006, the City Council unanimously voted to place a measure on the November 7, 2006 ballot asking for approval to exchange the Dutchman Pass parcel. Participating in the vote was current defendant and then Councilman Roger Tobler.

29. The Council unanimously approved at the same meeting a ballot question seeking voter approval to sell between 5 and 5 ½ acres for commercial uses, as required under Charter Section 140.1A.

30. In early 2006, in response to the Council vote on February 14 concerning Dutchman Pass, and alarmed at the reception of the Council to proposals entailing sudden growth of population immediately outside of city limits, Nolette and other concerned citizens formed a

committee to draft initiative questions, file them with the City Clerk, and then collected signatures to place them on the November 7, 2006 ballot.

31. The stated purposes of the 2006 initiative petitions were to either preserve the Transfer Area undisturbed, or alternatively to sell all the land, allow development in the Eldorado Valley, and distribute most of the land sale proceeds directly to Boulder City residents.

32. On April 25, 2006 during a regular City Council meeting, then Council members Karla Burton and Andrea Anderson made political statements in opposition to the initiative petitions being circulated.

33. At the same April 25, 2006 regular City Council meeting then Mayor Robert Ferraro also campaigned against the petitions in a public statement, saying the petitions would ruin the city. He complimented the City Council on its united stance to work together to maintain Boulder City as it was intended and to continue keeping it as it is.

34. These statements in opposition to the initiatives were aired repeatedly to Boulder City residents, twice daily for the next two weeks, on the City of Boulder City owned BCTV.

35. On June 13, 2006, the City Council voted to remove the three-way land exchange question from the November 7 2006 ballot, saying negotiations had made insufficient progress.

36. On June 13, 2006 the members of the initiative petitioners committee were served by the City of Boulder City with a lawsuit to stop the initiative process prior to the November 2006 election. The lawsuit advanced several legal theories.

37. At about this time the City Attorney David Olsen retained outside counsel, at Boulder City voter/taxpayer expense, to prosecute its case to obstruct the people of Boulder City from voting on their initiatives.

38. The outside counsel subsequently prepared a brief repeating the original legal

theories, and included an additional theory, the administrative-legislative exception.

39. On June 22, 2006, the initiative petition signatures were declared legally sufficient by Clark County Elections Department, and the initiatives were approved for inclusion on the November 2006 ballot.

40. On June 27, 2006 the City Council unanimously authorized the retention of the outside counsel already hired by City Attorney David Olsen to prosecute the obstruction of the citizens' initiatives at taxpayer expense.

41. At a hearing held in District Court in Las Vegas on July 7, 2006 Judge Kathy Hardcastle ruled from the bench against the petitioners, and ordered the initiatives removed from the November 2006 ballot.

42. The defendant petitioners appealed the decision to the Nevada Supreme Court, and oral arguments were heard in Carson City on August 10, 2006. Included in the briefs and oral arguments by appellants were that the judicially created administrative exception was previously and expressly disapproved by the U.S. Supreme Court as violating federal constitutional law. The City was again represented by outside counsel, with the City Attorney also present in Carson City, all at taxpayer expense.

43. On September 8, 2006 the Nevada Supreme Court in a non-published order affirmed the district court ruling against the initiative petitioners. The sole legal grounds relied upon by the Nevada Supreme Court for keeping the voters from speaking to the important issues about the long term future of their city was the judicially created administrative exception. The Nevada Supreme Court order also disposed of the U.S. Supreme Court precedent disapproving the administrative exception, saying it only applied to federal law.

44. The defendants of the 2006 lawsuit filed a petition for a writ of certiorari with the U.S. Supreme Court on December 6, 2006. Along with 99% of the petitions for writs submitted to the Court in 2006, it was not accepted.

45. The City Attorney, at the unanimous direction of the City Council, spent over $75,000 in taxpayer funds in 2006 to defeat the citizens' initiatives.

**Renewed Acts Under an Unlawful City Policy**

46. After the June 2009 municipal elections, the City Council consisted of Mayor Roger Tobler, and Council members Linda Strickland, Travis Chandler, Duncan McCoy, and Cam Walker.

47. From November 2009 through January 2010 the City Council considered questions for placement on the November 2, 2010 general election ballot.

48. On November 24, 2009, Councilman Chandler moved, at the prior specific request of constituents and among several other questions, to ask the voters to amend the Charter to make the City Attorney office subject to election by the voters. Councilmen McCoy and Walker were joined by Mayor Tobler in voting in opposition to the motion.

49. Also on November 24, 2009, Chandler moved at the prior specific request of constituents to ask the voters to amend the Charter to require voter approval of any issuance of new debt in excess of $1,000,000. There was no second.

50. On November 24, 2009, Councilwoman Strickland moved at the prior specific request of constituents to ask the voters an advisory question on whether the City owned Boulder Creek Golf Club ("Boulder Creek") should be closed. Strickland's motion failed 2-3, with McCoy, Walker, and Tobler arguing and voting against.

51. The City's audited Comprehensive Annual Financial Reports shows Boulder Creek has directly lost and otherwise been subsidized by millions of taxpayers' dollars each year since it opened in 2003. It has been a major political issue in Boulder City for its entire existence.

52. Other ballot questions asking for approval to sell residential and commercial land at Boulder Creek for public safety purposes were approved by the Council at this time.

53. No homes or private properties are located on Boulder Creek. Pursuant to Charter Section 140.1.A sales of residential lots at Boulder Creek were rejected by Boulder City voters in November 2004 and again in June 2005. In June 2007, sales of residential lots across the street from Boulder Creek were also rejected by the voters.

54. Mayor Roger Tobler's personal residence is 1007 Providence Lane, Boulder City, NV in the residential neighborhood closest to Boulder Creek, just across the street. Tobler's driveway is within 185 yards of the Boulder Creek property as the golf ball flies, and also within 225 yards of the older Boulder City Municipal Golf Course.

55. Councilman Cam Walker's personal residence is 1533 Independence Way, Boulder City, NV also in the same residential neighborhood closest to Boulder Creek. Walker's driveway is within 325 yards of the Boulder Creek property as the golf ball flies and also less than 100 yards, an easy chip shot, of the Municipal Golf Course.

56. The subdivision, sales, and development of Tobler's and Walker's neighborhood preceded the City Council decision in 2001 to build Boulder Creek by several years. Because properties located in proximity to Boulder Creek are unintended beneficiaries, their owners have no legal rights, interests, or claims that would require its continued operation at taxpayer expense. The amount of property value appreciation Tobler's and Walker's residences enjoy

attributable to their close proximity to Boulder Creek are unearned windfalls, but also significant pecuniary interests that Tobler and Walker have enjoyed since construction was approved.

57. In contrast, properties located near and on the much older Municipal Golf Course are intended beneficiaries of that course, as a consequence of voter approval of residential lot sales to pay for the Municipal course. Their owners have a vested legal interest in that golf course's ongoing successful operation.

58. In early January 2010 a group of concerned residents gathered to draft ballot questions for the November 2010 election. The group drafted three ballot questions: a Charter Amendment for the election rather than appointment of the City Attorney ("elect the City Attorney"); establishment of a citywide policy that the City would own not more than one 18-hole golf course ("golf course"); and limit any new city debt obligations to $1 million without voter approval ("debt limit").

59. These initiatives were drafted and intended to establish new policies affecting the entire City. None of them identify any specific person, property, contract, or thing.

60. The members of the initiative petition committees were Daniel Jensen, Walt Rapp, Frank Fisher, Cynthia Harris, Norbert "Johnny" Kastl, Nancy Nolette, Linda Henry Schrick, and James Douglass. Not all of the foregoing members served on every committee.

61. Mr. Jensen, Boulder City resident and contact person for the initiative petitions committees, presented the drafts of the ballot questions to the City Attorney Olsen for review for legal sufficiency pursuant to Charter Section 119 on March 9, 2010.

62. Olsen flatly refused to review any of the questions, citing conflict of interest. Olsen's legal theory, publicly stated, is that his client is the City Council, and not the people of the City collectively, who with their taxes pay his salary.

63. The City Charter Article I Section 1, Incorporation, in its first sentence defines Boulder City as " . . . the inhabitants . . .".

64. The City Council majority had previously opposed these matters as specific ballot questions on November 24, 2009. Olsen anticipated suing the petitioners on behalf of the Council majority, in a replay of events from 2006, to prevent the nearly 1,000 registered voters who eventually signed each petition, and the nearly 7,000 residents and inhabitants who eventually voted, from exercising their statutory and constitutional rights.

65. Copies of the initiatives were provided to the City Clerk and signature collection began on March 21, 2010.

66. A fourth question, introducing term limits for the city's official volunteer boards, commissions, and committees ("term limits") was drafted a few weeks later, and sufficient signatures were gathered within the remaining time allowed.

67. Six hundred and forty two signatures, that is, a number equal to 15% of 4,264 voters in the June 2009 municipal election, were required for each of the questions to be placed on the November 2010 ballot. Hundreds of extra signatures were obtained for each to ensure petition qualification during the verification process.

68. On July 13, 2010 Clark County Elections Department verified the signatures and authorized all four initiatives to be placed on the November ballot.

69. On July 28, 2010 all 8 petitioners were served with a legal complaint and summons originating from the City of Boulder City as plaintiff, seeking a stop order regarding three of the four ballot questions.

70. The initiative to elect the City Attorney as a Charter Amendment was not challenged by the City Attorney or the outside counsel he had retained. This avoided an obvious ethics complaint involving a conflict of interest.

71. On all of the other matters, City Attorney Olsen sued the City, that is, the inhabitants as defined in the Charter, with the object of depriving all the people of their federal constitutional rights, including freedom of political speech. Olsen's actions also violated certain of the people's reserved powers under the Nevada constitution, Nevada Revised Statutes, and the Boulder City Charter.

72. The City's action sought 1) to have all three initiatives declared illegal, 2) to keep them off the November ballot, and 3) "such further and additional relief as the Court may deem appropriate …."

73. This action and the retention of outside counsel was commenced by Olsen prior to any official action or direction from the City Council. The Boulder City Charter Section 15.4 requires the City Attorney to get approval of the City Council to obtain outside legal services.

74. The initiative petitioners contacted Councilman Chandler and Councilwoman Strickland telling them they had been sued by the City; this was news to both Chandler and Strickland. Chandler promptly placed the matter on the agenda for the next City Council meeting, August 10, 2010.

75. Petitioner Norbert "Johnny" Kastl, age 83, pursuant to his statements that he was fearful of legal expense and personal liability from being named as a defendant, signed documents prepared by Olsen asking to withdraw from membership on the petitioners committee, and the lawsuit. He was dismissed as a named defendant on the one initiative that he had signed, the golf course.

76. The remaining petitioners attended the Council meeting on August 10, 2010. At that meeting Olsen stated that he had acted on his own authority in filing the lawsuits. He maintained he did not need Council approval.

77. The legal theory declared against each initiative was the same in each case, that they were allegedly unconstitutional under Nevada's judicially created administrative-legislative exception. This was the same legal theory employed successfully against the earlier petitioners committee during 2006. An additional new legal theory was that all of the petitioners' descriptions of effect were defective.

78. Frank Fisher and plaintiff Nolette, as members of the petitioners committees in both 2006 and 2010, were named defendants in lawsuits both years.

79. At the August 10, 2010 City Council meeting, following extensive public comment largely opposing the lawsuits, a motion to direct Olsen to continue the lawsuit ahead of the election seeking removal of the committee term limit question from the ballot failed 0 - 4, with Councilman Duncan McCoy absent.

80. At the same meeting a motion to direct the Olsen to continue the lawsuit ahead of the election seeking removal of the debt limit question from the ballot failed 1 - 3, with Walker voting in favor and McCoy absent.

81. At the same meeting a motion to direct Olsen to continue the lawsuit seeking removal of the golf course question from the ballot ahead of the election tied 2 - 2, with Walker and Tobler voting in favor and McCoy absent.

82. In voting as they did, Yea on some, Nay on others, both Walker and Tobler necessarily disregarded the principal legal theory of Olsen and the outside counsel who were

present at taxpayer expense, that all three ballot questions were illegal under the administrative exception. Therefore Walker and Tobler necessarily had based their votes on other reasons.

83. Strickland and Chandler disagreed with the administrative exception legal theory completely, as previously expressly disapproved by the U.S. Supreme Court as violating federal constitutional law, and voted accordingly to stop the obstruction of the federal constitutional rights of the people to vote on these important matters.

84. Olsen announced immediately after those Council votes he would continue the golf course lawsuit pre-election, and would wait until after the election to proceed against the committee term limit and debt limit initiatives.

85. In the days following the August 10 meeting, six of the initiative petitioners (Mr. Jensen, Mr. Rapp, Mr. Douglass, Ms. Harris, Ms. Nolette, and Mr. Fisher) retained the Law Firm of Linda G. Strickland to prepare replies and represent them in the forthcoming hearings.

86. Because she was incorrectly identified in the City's original pleadings, petitioner Linda Henry Schrick never felt it was necessary to respond to the lawsuits. Norbert "Johnny" Kastl also did not participate, having removed himself from the case as described *supra* (#75).

87. In the first hearing on September 8, 2010, District Court Judge Allan Earl denied Olsen's motion to remove the golf course initiative from the ballot, ruling it was legislative in character. He also ruled the description of effect was not defective. Judge Earl told Olsen and his outside counsel to let the people vote on all the ballot initiatives.

88. Thereafter, Tracy Strickland from the Law Firm of Linda G. Strickland, filed Anti-SLAPP special motions to dismiss under NRS 41.660 against the City on the three cases. Because the Anti-SLAPP law has the potential to dramatically shorten or eliminate the litigation

97. A notice of appeal of Judge Tao's decision was filed on January 24, 2011 with the Nevada Supreme Court.

98. The Anti-SLAPP special motion to dismiss case A-10-629989-C regarding the committee term limits initiative was heard on January 21, 2011 by Judge Susan Scann. Judge Scann ruled that the city was aware of, but purposely failed to use NRS 43.100 as the appropriate legal method to challenge an ordinance. Judge Scann's hearing was continued to February 25, 2011 and again to April 1, 2011 for the City to reply to her decision.

99. NRS 43.100 avoids naming citizens as defendants when they sought political change through the initiative process expressly invited by Article XIX of the Nevada constitution. Those citizens would avoid under NRS 43.100 the mental distress the petitioners felt concerning litigation, financial liability, and legal expense.

100. Judge Scann ruled that Boulder City was guilty of "Judge Shopping" by filing multiple lawsuits, since she was hearing a 3rd lawsuit for ballot questions between the same parties, and challenged under the same legal theories, stating that they could have been combined. She fined the City $10,000 plus court costs.

101. On Olsen's authority, the City appealed. On or about July 27, 2012, The Nevada Supreme Court dismissed Olsen's appeal of Judge Scann's sanctions.

102. Judge Scann also ordered in 2011 the committee term limits ordinance and the debt limit ordinance be consolidated into the same appeal to the Nevada Supreme Court, case A-10-629988-C.

103. As of February 2012, the City has spent $178,282.67 of taxpayer dollars in legal fees to Olsen's outside counsel. Additionally, the City Attorney had earned for the City a $10,000 court sanction and $925.49 in court costs.

97. A notice of appeal of Judge Tao's decision was filed on January 24, 2011 with the Nevada Supreme Court.

98. The Anti-SLAPP special motion to dismiss case A-10-629989-C regarding the committee term limits initiative was heard on January 21, 2011 by Judge Susan Scann. Judge Scann ruled that the city was aware of, but purposely failed to use NRS 43.100 as the appropriate legal method to challenge an ordinance. Judge Scann's hearing was continued to February 25, 2011 and again to April 1, 2011 for the City to reply to her decision.

99. NRS 43.100 avoids naming citizens as defendants when they sought political change through the initiative process expressly invited by Article XIX of the Nevada constitution. Those citizens would avoid under NRS 43.100 the mental distress the petitioners felt concerning litigation, financial liability, and legal expense.

100. Judge Scann ruled that Boulder City was guilty of "Judge Shopping" by filing multiple lawsuits, since she was hearing a 3rd lawsuit for ballot questions between the same parties, and challenged under the same legal theories, stating that they could have been combined. She fined the City $10,000 plus court costs.

101. On Olsen's authority, the City appealed. On or about July 27, 2012, The Nevada Supreme Court dismissed Olsen's appeal of Judge Scann's sanctions.

102. Judge Scann also ordered in 2011 the committee term limits ordinance and the debt limit ordinance be consolidated into the same appeal to the Nevada Supreme Court, case A-10-629988-C.

103. As of February 2012, the City has spent $178,282.67 of taxpayer dollars in legal fees to Olsen's outside counsel. Additionally, the City Attorney had earned for the City a $10,000 court sanction and $925.49 in court costs.

104. In April 2012, petitioners' attorney Linda Strickland petitioned the Nevada Supreme Court to help expedite the case in view of the ongoing delay and the advanced age of most of the defendants.

105. From 1982 to 2012 Boulder City has placed 58 questions on ballots for the voters' consideration, many of them citizen initiatives.

106. Since 2006 the City Attorney has commenced legal challenges against every citizen initiative that has come before it, with the singular exception of the one directed at the City Attorney's office itself. In all of these lawsuits the City retained outside counsel, all were at significant taxpayer expense, and all lawsuits and expenses were approved by the majority on the City Council.

**CAUSES OF ACTION**

**COUNT ONE**

**Constitutional and Civil Rights Pursuant to 42 U.S.C. §§ 1983, 1988**

**Violation of First Amendment Speech Rights (Against all Defendants)**

107. The foregoing allegations are incorporated as if re-alleged herein.

108. Defendants have used the courts and expended taxpayer funds to prevent consideration and passage by voters of ballot measures which they had previously opposed.

109. Defendants have commenced legal challenges against voter initiatives under legal theories that they do not apply to similar questions they themselves put before the voters.

110. Starting in 2006, resuming in 2010, and continuing to the present day Defendants have established a general City policy of opposing all voter initiatives with the purpose of chilling political speech. Defendants execute that policy using the financial and legal resources of the City to launch legal challenges of the voter initiatives.

111. Defendants have intentionally sought to make the challenges as burdensome on the Plaintiffs as possible by separating what is the same legal question into separate lawsuits and courts, resulting in a greater burden on Plaintiffs' time and financial resources to respond to the separate sections.

112. Defendants have intentionally sought to cause Plaintiffs emotional distress, when Nevada has provided alternative legal means for judicial review which Defendants intentionally and with callous disregard for the petitioners chose not to use, by directly suing the members of the petition committee instead and causing them to fear liability.

113. Defendants have intentionally sought to exhaust the patience and financial resources of Plaintiffs by appealing the state district court decisions and sanctions against them.

114. Defendants acted intentionally and with callous disregard for Nolette's known statutory and constitutional rights, at all times under color of law.

115. As a direct result of the actions, statements and/or policies of the Defendants, Nolette and Plaintiffs and the people of Boulder City suffered an unconstitutional invasion of their freedom of speech rights and rights to petition under the First and Fourteenth Amendments to the U.S. Constitution, as well as under Nevada law.

116. As a direct and proximate result of the Defendants' violations of Nolette's statutory and constitutional rights as described herein, Nolette has suffered damage to her reputation, humiliation, embarrassment, mental and emotional anguish and distress and violation of her rights to free speech and to petition as protected under the Constitution, as well as other compensatory damages, in an amount to be determined by a jury and the Court.

**COUNT TWO**

**Constitutional and Civil Rights Pursuant to 42 U.S.C. §§ 1983, 1988**

**Violation of First, Ninth, and Tenth Popular Sovereignty Rights**

**(Against all Defendants)**

117. The foregoing allegations are incorporated as if re-alleged herein.

118. Defendants have used the courts to prevent consideration and passage by voters of ballot measures which they are previously on record as having opposed.

119. Defendants have commenced legal challenges against voter initiatives claiming legal theories that they do not apply to similar questions they themselves put before the voters.

120. Going back to 2006, resuming in 2010, and continuing to the present day defendants have established a City policy of opposing all voter initiatives. Defendants execute that policy using the financial and legal resources of the City to challenge the voter initiatives in the courts.

121. Defendants acted intentionally and with callous disregard for Nolette's known statutory and constitutional rights, at all times under color of law.

122. As a direct result of the actions, statements and/or policies of the Defendants, Nolette and other Plaintiffs and the people of Boulder City suffered unconstitutional invasions of their powers and rights of popular sovereignty under the First, Ninth, Tenth, and Fourteenth Amendments to the U.S. Constitution, as well as under Nevada law.

123. As a direct and proximate result of the Defendants' violations of Nolette's and other Plaintiff's statutory and constitutional rights as described herein, Nolette and other Plaintiffs and the people of Boulder City have suffered damages of unlawful expense to public funds, mental and emotional anguish and distress and violation of their rights powers and rights of popular

sovereignty as protected under the Constitution, as well as other compensatory damages, in an amount to be determined by a jury and the Court.

**COUNT THREE**

**Constitutional and Civil Rights Pursuant to 42 U.S.C. §§ 1983, 1988**

**Violation of Constitutional Rights Protected by Nevada Ethics Law**

**(Against Defendants Tobler and Walker)**

124. The foregoing allegations are incorporated as if re-alleged herein.

125. Defendants Tobler and Walker have used, or attempted to use the courts to prevent consideration and passage by voters of ballot measures which they are previously on record as having opposed.

126. Defendants Tobler and Walker have committed the unlawful unconstitutional acts alleged herein in the face of their particular duty under Nevada's ethics law NRS 281A to publicly disclose their own pecuniary interest in certain of the litigated matters, and to abstain from advocating against and voting on the Council against those matters.

127. Defendants acted intentionally and with callous disregard for Nolette's and other Plaintiffs' known statutory and constitutional rights, at all times under color of law.

128. As a direct result of the actions, statements and/or policies of the Defendants, Nolette and other Plaintiffs and the people of Boulder City suffered an unconstitutional invasion of their freedom of speech rights, and the powers and rights of popular sovereignty under U.S. Constitution, as well as under Nevada law.

129. As a direct and proximate result of the Defendants' violations of Nolette's statutory and constitutional rights as described herein, Nolette and other Plaintiffs and the people of

Boulder City have suffered damages of expense to public funds, mental and emotional anguish and distress and violation of their rights protected under the Constitution, as well as other compensatory damages, in an amount to be determined by a jury and the Court.

**DEMAND**

WHEREFORE, Plaintiff, Nancy a. Nolette, requests judgment against Defendants as follows:

A. For appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of Defendants.

B. For appropriate compensatory damages in an amount to be determined at trial;

C. For appropriate equitable relief against all Defendants as allowed by the Civil Rights Act of 1871, 42 U.S.C. Section 1983, including the enjoining and permanent restraining of these violations, and direction to Defendants to take such affirmative action as is necessary to ensure that the effects of the unconstitutional and unlawful practices are eliminated and do not continue to affect Plaintiff's, or others', political rights of citizenship;

D. For an award of exemplary damages against Defendants Tobler, Walker, McCoy, and Olsen in their individual capacities;

E. For an award of reasonable attorney's fees and costs on behalf expended as to such Defendants pursuant to the Civil Rights Act of 1871, 42 U.S.C. Section 1988; and

F. For such other and further relief to which Plaintiff may show herself justly entitled.

**PLAINTIFF REQUESTS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

I understand that a false statement or answer to any question in this complaint will subject me to penalties of perjury. **I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.** See 28 U.S.C. § 1746 and 18 U.S.C. § 1621.

Dated this 9th day of August, 2012

Nancy A. Nolette

NANCY A. NOLETTE
*Plaintiff in Pro Se*
216 Bighorn Drive, Unit 1
Boulder City, NV 89005

NANCY A. NOLETTE
Plaintiff *in pro se*
216 Bighorn Drive, Unit 1
Boulder City, NV 89005
702-293-7077

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| NANCY A. NOLETTE, *in pro se* and DOES 1-10<br>Plaintiffs,<br>vs.<br>ROGER TOBLER, CAM WALKER, DUNCAN MCCOY, DAVID OLSEN, all in their official and individual capacities; and the CITY OF BOULDER CITY<br>Defendants | Case No.:<br><br>CIVIL RIGHTS COMPLAINT PURSUANT TO 42 U.S.C. §§ 1983, 1988 |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**CONSTITUTIONAL PROVISIONS AND STATUTES INVOLVED**

The First Amendment to the Constitution of the United States Free Speech clause and the Assembly and Petition clauses provide: "Congress shall make no law . . . abridging the freedom of speech, . . . or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

The Ninth Amendment to the Constitution of the United States provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

The Tenth Amendment to the Constitution of the United States provides "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Section 1 of the Fourteenth Amendment to the Constitution of the United States provides:

"... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Article I Section 2 of the Constitution of Nevada provides in part: "All political power is inherent in the people [.] Government is instituted for the protection, security and benefit of the people; and they have the right to alter or reform the same whenever the public good may require it."

The Constitution of Nevada was amended to provide for voter initiatives and referenda in 1905 by Article XIX. The relevant sections of Article XIX, as amended, are:

Article XIX, Section 2.1. Notwithstanding the provisions of Section 1 of Article 4 of this Constitution, but subject to the limitations of Section 6 of this Article, the people reserve to themselves the power to propose, by initiative petition, statutes and amendments to statutes and amendments to this Constitution, and to enact or reject them at the polls.

Article XIX, Section 4. The initiative and referendum powers provided for in this article are further reserved to the registered voters of each county and each municipality as to all local, special and municipal legislation of every kind in or for such county or municipality. In counties and municipalities initiative petitions may be instituted by a

number of registered voters equal to 15 percent or more of the voters who voted at the last preceding general county or municipal election. Referendum petitions may be instituted by 10 percent or more of such voters.

The Charter of Boulder City, Nevada, Article XV, Section 140.1.A provides:

All City-owned lands shall be sold or otherwise disposed of by ordinance, and any sales or disposition of parcels of more than one acre must be approved by the registered voters of the City at an election held in conjunction and in accordance with the election as required by Article XV, Section 143 of the Boulder City Charter.

## ARGUMENT

### I. Did Defendants Violate Plaintiffs' Federal Constitutional Guarantees of Freedom of Speech?

The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States, 354 U.S. 476, 484 (1957).* The circulation of petitions for ballot initiatives and referenda are "core political speech" within "an area in which the importance of First Amendment protections is "at its zenith." " *Meyer v. Grant, 486 U.S. 414, 425 (1988).* The protections of the First Amendment are enforceable against the states through Section 1 of the Fourteenth Amendment. Limitations on political expression are subject to exacting scrutiny. *Meyer v. Grant, 486 U.S. 414, 420 (1988).*

Core political speech is advanced where ballot petitioners can "make the matter the focus of statewide discussion" not just by gathering petition signatures, but by getting the matter on the

ballot before the voters. *Meyer v. Grant, 486 U.S. 414, 423 (1988)*. An initiative or referendum that comes before the electorate advances core political speech because it

> "ensures that all the people of a community will have a voice in a decision which may lead to large expenditures of local governmental funds for increased public services and to lower tax revenues. It gives them a voice in decisions that will affect the future development of their own community." *James v. Valtierra, 402 U.S. 137,143 (1971).*

Defendants in this case have challenged the initiatives as a forbidden intrusion upon the administrative authority of the Council under the judicially-created administrative exception. However, the strict language of the Nevada Constitution, Article XIX, does not expressly exclude administrative matters. In fact, the word "administrative" appears nowhere at all in Article XIX. This omission simply cannot be attributed to the desires of the drafters of Article XIX for severe brevity. Article XIX exclusive of titles, proposed amendments, and historic notes contains over 1900 words. It is rich in details and specifics. The drafters of Article XIX never intended such a broad and ill-defined exception when they "wrote all legislation of every kind." Certainly the voters of Nevada statewide who approved it never intended such limitations upon themselves.

The administrative exception exists in Nevada solely as a judicially-created rule adopted in a line of cases starting in 1973. In *Forman* a referendum and an initiative concerning zoning changes to a single commercial property were both invalidated after the election. *Forman v. Eagle Thrifty Drugs & Markets, 89 Nev. 533, 516 (1973)*. In *Fuji Park* an initiative to preserve a large city park was invalidated prior to the election. *Glover v. Concerned Citizens for Fuji Park, 118 Nev. 488 (2002)*. In *Train Trench* an initiative to stop the construction of a $280 million lowered railroad through Reno was invalidated pre-election. *Citizens for a Public Train Trench*

*Vote v. Reno, 118 Nev. 574 (2002).* In *Garvin*, a petition to limit the number of building permits countywide was invalidated under the administrative exception in a district court proceeding but reinstated in the Supreme Court of Nevada pre-election, *Garvin v. Ninth Judicial Dist. Ct., 118 Nev. 749 (2002).* In *Garvin*, the Supreme Court of Nevada overruled parts of *Forman*, concluding that general zoning matters were now legislative and not administrative, and also overruling parts of *Fuji Park*, and *Train Trench*, the latter two cases decided just months prior to *Garvin*.

The Supreme Court of Nevada has admitted the administrative exception is vague: "This legislative-administrative dichotomy is often vague . . ." *Forman, 89 Nev. at 537.* In its application, the Supreme Court of Nevada continues to use indefinite terminology: ". . . an initiative creating a general land-use policy (establishing a commercial buffer zone around elementary and junior high schools) *seemed* legislative, but the land- specific referendum at issue in Forman (merely rezoning a single parcel owned by one entity) *seemed* administrative." (*emphasis added*)

Other states also maintain a distinction between initiatives that are legislative in character and those that are administrative, but the states categorize matters differently: "While courts draw similar distinctions, they are not entirely consistent about which category any particular type of measure fits within." *Train Trench, 118 Nev. 574, 583 (2002).* Nevada has ruled sales of specific parcels of municipal land as administrative, while Texas has held that such sales are legislative as a matter of law. *Humphrey v. Balli, 61 S.W.3d 519 (2001).* In *Balli*, the Texas appellate court applied the same test to distinguish between legislative and administrative, from *Denman*, that was first used by Nevada in *Forman* and affirmed in *Garvin*:

"An ordinance originating or enacting a permanent law or laying down a rule of conduct or course of policy for the guidance of the citizens or their officers and agents is purely legislative in character and referable, but an ordinance which simply puts into execution previously-declared policies, or previously-enacted laws, is administrative or executive in character, and not referable." *Denman v. Quin, 116 S.W.2d 783, 786 (Tex. Civ. App. 1938).*

Application of the administrative exception rules adopted by state courts is further confounded by other issues: "whether a particular municipal activity is "administrative" or is "legislation" often depends not on the nature of the action but the nature of the legal framework in which the action occurs." *Train Trench, 118 Nev. 574, 583.* From the turmoil of Nevada cases in 2002, two of which were partly overruled before the end of the same year they were decided, it is clear the administrative exception is not established on a firm foundation. The vagueness of the tests for the administrative exception gives courts unfettered discretion to dispose of initiatives and referenda: ". . . but it is this very vagueness which has given the courts considerable leeway in balancing two competing interests: that of protecting government from unwarranted harassment and the equal interest in protecting benefits to be won through direct legislation." *Forman, 89 Nev. 533, 537,516 P.2d 1234, 1236.*

These vague rules that give courts and local officials considerable leeway serve as unfettered discretion to limit core political speech, and are impermissible under the First Amendment: ". . . an ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official . . . is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Staub v. Baxley, 355 U.S. 313, 322 (1967).* Also: "government may not grant the use of a forum to

people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities." *Police Dep't of Chicago v. Mosley, 408 U.S. 92, 96 (1972).*

The administrative exception is a powerful tool that public officials can use to quash initiatives they oppose. For example, Section 140.1.A of the Charter of Boulder City requires a voter referendum each time the City Council wants to sell more than one acre of city owned land. Officials of the City of Boulder City have abused this unfettered discretion when, pursuant to the Charter, they placed their own preferred land sale measure on the ballot (later removing it) then used the judicially created administrative exception to remove the citizens' initiatives for land sales they opposed to remove land sales initiatives from citizens, and yet allowed another specific land sale measure of their own origin on the November 7, 2006 general election ballot, all within the same election cycle and calendar year.

Boulder City officials in 2006 took advantage of this unfettered discretion when they blithely ignored the *Forman* requirement that voters are strictly forbidden by the Nevada Supreme Court to intrude upon "administrative" matters whether the ballot question is referred by the governing body or originating as citizen initiatives.

Defendant Boulder City officials continue to abuse their unfettered discretion by placing additional land sales questions on the November 2, 2010 ballot, where the Nevada Supreme Court has previously ruled in 2006 such land sale measures are "administrative" and therefore forbidden to the voters, but simultaneously arguing that the 2010 initiative petitions proposing new citywide policies without identifying any specific parcel of land, contract, person or thing are nevertheless also "administrative".

To justify a restriction upon freedom of speech rights based on content, the state has the very high burden of showing a compelling interest. The Supreme Court of Nevada has offered the vagueness of the administration exception as affording the benefit of "protecting government from unwarranted harassment", *Forman, 89 Nev. 533, 537,516 P.2d 1234, 1236.*

However, the interest of avoiding unwarranted harassment, even if rises to the level of sufficiently compelling, is not best served by this means. The minimum number of petition signers, 10% of voters statewide *Nev. Const. art. 19, § 2*, or 15% for municipal elections *Nev. Const. art. 19, § 4*, already provides a better, content-neutral barrier sufficient to eliminate measures that are intended solely to harass government, but lack any real popular support.

The Supreme Court of Nevada reaffirmed the protecting-government-from-harassment state interest in its 2006 Order of Affirmance against the citizens of Boulder City striking the initiatives to "sell" the Transfer Area: "The significant time and resources implicated by implementing these administrative details illuminates the policy underlying the administrative act exception: to prevent the electorate from destroying or impeding the efficient administration of governmental affairs." Never mind that the cost of that administrative burden could be offset under the Charter Section 142 from the proceeds of the sale. Thus the Nevada Supreme Court has discovered policy reasons never contemplated by the Nevada Legislature, much less the voters of Nevada, in its judicially-created vague and overly broad administrative exception to the broad reserved powers of the people under Article XIX of the Nevada constitution.

The administrative exception instead is a broad, and in fact an overbroad restriction on core political speech, not narrowly tailored to serve any policy or state interest. Specifically, the Nevada Supreme Court also used the administrative exception to strike the "preserve" initiatives from the Boulder City ballot in 2006, which would impose no increased burden at all upon city

administration. The very essence of the "preserve" initiatives from 2006 was to require the City administration to do nothing. Further, many initiatives that "seem legislative", and therefore are permissible, also have the effect of increasing the burden upon the efficient administration of governmental affairs.

Nevada voters understand that initiatives, their elections, and government itself are expensive and complicated matters. Nevertheless they have reserved to themselves the right and the power to make those choices directly. It is their fundamental right to speak collectively about how their government may best serve them.

**II. Did Defendants Violate Plaintiffs Federal Constitutional Rights of Popular Sovereignty?**

"[I]t is the Right of the People to alter or to abolish [Government], and to institute new Government . . ." *Declaration of Independence, July 4, 1776.*

This declaration of popular sovereignty is echoed in the Preamble to the Constitution: "We the People . . . do ordain and establish this Constitution for the United States of America . . ." and was a recurring theme throughout its ratification debates, *e.g.*: " . . . It only supposes that the power of the people is superior to both [the legislature and the judiciary]. " *The Federalist Papers, No. 78 (Hamilton)*. And: "Here, in strictness, the people have surrendered nothing; and as they retain everything, they have no need of particular reservations." *The Federalist Papers, No. 84 (Hamilton).*

The Bill of Rights are commonly thought of today as concerned only with countermajoritarian protections of the rights of individuals and minority groups. However, the original intent included the purpose of popular sovereignty as well, of securing the rights of the majority against abuse by a self-interested Congress:

> "Our First Amendment's focus on Congress suggests that its primary target was attenuated representation, not overweening majoritarianism. Congress was singled out precisely because it was *less* likely to reflect majority will."[1] *(emphasis in original)*

Thus the First Amendment "right of the people peaceably to assemble, and to petition the Government for a redress of grievances" was intended to enable and protect the people in their exercise of their popular sovereignty, for example, in convention.

The Ninth Amendment has most commonly been invoked for the countermajoritarian protections it provides individuals. However, the original intent behind the Ninth Amendment is better seen as a protection of the collective, majoritarian right of popular sovereignty: "Indeed the most obvious and inalienable right underlying the Ninth Amendment is the collective right of We the People to alter or abolish government, through the distinctly American device of the constitutional convention."[2] Or through outright war, if we are permitted to assume the events of barely a decade before its ratification in 1791 had not been forgotten by the framers.

The Tenth Amendment has been invoked most commonly as a source of protection of the powers of the states from encroachment by the federal government. However, its original intent was also a declaration of popular sovereignty with respect to both the federal government and the states: "The popular sovereignty motif of the Tenth Amendment could not be more obvious. We the People, acting collectively, have delegated some powers to the federal government, have allowed others to be exercised by state governments, and have withheld some things from all governments."[3] Other sources support this as the original intent in the drafting the Tenth Amendment:

---

[1] Akhil Reed Amar; *The Bill of Rights: Creation and Reconstruction.* Yale University Press, New Haven, 1998, p 22.

[2] Id. at 120.

[3] Id. at 119.

"What little evidence we have from the First Congress tends to confirm that . . . a stated general reservation of power should reflect that it is the people who grant and reserve powers to both the federal and state governments, and therefore that the reserved powers are reserved first to the people and second to the states."[4]

While a very few of the provisions of the Bill of Rights have not been incorporated as applying to the states by means of Section 1 of the Fourteenth Amendment, those that concern popular sovereignty have been. The popular sovereignty provisions should apply even before incorporation, since for the People to retain sovereignty over the federal government but to be subservient to the states makes no sense. This Court has consistently recognized the primacy of popular sovereignty, from early in the nation's history:

"From these Conventions the constitution derives its whole authority. The government proceeds directly from the people; is "ordained and established" in the name of the people; . . . The government of the Union, then, . . . is, emphatically, and truly, a government of the people. In form and in substance it emanates from them. Its powers are granted by them, and are to be exercised directly on them, and for their benefit." *McCulloch v. Maryland, 17 U.S. 316, 403-405, 4 Wheat 316 (1819).*

Much more recently, in *City of Cuyahoga Falls v. Buckeye Community Hope Foundation, 538 U.S. 188, 123 S. Ct. 1389 (2003)*, this United States Supreme Court unanimously rejected the administrative exception to voter referendums:

"As a matter of federal constitutional law, we have rejected the distinction that respondents ask us to draw, and that the Ohio Supreme Court drew as a matter of state law, between legislative and administrative referendums. In *Eastlake v. Forest City*

---

[4] Thomas B. McAffee, Jay S. Bybee, A. Christopher Bryant; *Powers Reserved for the People and the States: A History of the Ninth and Tenth Amendments*, Praeger Publishers, Westport, 2006, p 43.

//

*Enterprises, Inc., 426 U.S., at 672, 675*, we made clear that because all power stems from the people, "[a] referendum cannot . . . be characterized as a delegation of power," unlawful unless accompanied by "discernible standards." The people retain the power to govern through referendum "'with respect to any matter, legislative or administrative, within the realm of local affairs.'" *Id., at 674, n. 9.* Cf. *James v. Valtierra, 402 U.S., at 137.* Though the "substantive result" of a referendum may be invalid if it is "arbitrary and capricious," *Eastlake v. Forest City Enterprises, supra, at 676*, respondents do not challenge the referendum itself. The subjection of the site-plan ordinance to the City's referendum process, regardless of whether that ordinance reflected an administrative or legislative decision, did not constitute *per se* arbitrary government conduct in violation of due process." *Cuyahoga Falls, 538 U.S., at 199, 123 S. Ct., at 1396.*

This passage was quoted as presented here in Appellants' brief to the Supreme Court of Nevada in 2006. The federal constitutional law invoked in *Cuyahoga* is the protection of core political speech in the referendum process, and the assertion of popular sovereignty where "all power stems from the people".

Boulder City appellants in 2006 argued before the Supreme Court of Nevada that the scope of popular sovereignty was unlimited in the plain language and intent of the Nevada constitution: "All political power is inherent in the people[.] Government is instituted for the protection, security and benefit of the people; and they have the right to alter or reform the same whenever the public good may require it." *Nev. Const. art. 1, § 2.* Appellants further argued that the administrative exception to the right and power of the people to petition government was not authorized by the Nevada Constitution, where "The initiative and referendum powers provided for in this article are further reserved to the registered voters of each county and each

municipality as to all local, special and municipal legislation of every kind in or for such county or municipality. *Nev. Const. art. 19, § 4.*"

But the Supreme Court of Nevada rejected those arguments, and affirmed its holding in *Forman* that the Nevada Constitution does not permit a delegation of powers to the people concerning initiatives and referenda that are administrative. In *Forman* the Supreme Court of Nevada characterizes administrative matters as an impermissible delegation of power to the people: "When in a matter of state-wide concern the state legislature has specifically delegated particular authority to a governing board, the courts have uniformly held that initiative processes do not ordinarily apply. 5 McQuillan, Municipal Corporations, Sec. 16.52. The State of Nevada has delegated comprehensive powers to cities and towns in the area of zoning regulation." *Forman, 89 Nev. 533, 538, 516 P.2d 1234, 1237.*

Here, Nevada (and other states elsewhere) characterise administrative matters as delegations by a legislature of power to its agencies and entities, where such a "delegation" to a popular vote is constitutionally impermissible. This view has been expressly disapproved by this the Supreme Court of the United States in *Cuyahoga* and the line of cases cited therein.

The Supreme Court of Nevada distinguished the opinion in *Cuyahoga* rejecting the administrative exception, saying the opinion applies only to "federal constitutional law." This ignores the express language from *Cuyahoga* that rejects the administrative exception on "federal constitutional" grounds - not in the context of a national referendum - but rather in the context of local affairs: "The people retain the power to govern through referendum 'with respect to any matter, legislative or administrative, *within the realm of local affairs*.' " *Cuyahoga, 538 U.S. at 199 (emphasis added).* Because there is no federal constitutional or statutory method of voter

initiative or referendum to provide for direct voter legislation at the national level, the language of *Cuyahoga* must be interpreted as applying only to state and local law.

The Supreme Court of Nevada ignored this obvious point, not to mention the plain language "within the realm of local affairs", when it went on to say "This decision, moreover, concurrently acknowledges that the distinction may exist as a matter of state law." The Supreme Court of Nevada thus holds that a state court interpretation of state law, repugnant to federal constitutional protections of the peoples' most fundamental rights, is permissible.

As counsel for the City in this 2006 ballot case, Defendant Olsen is familiar with the U.S. Supreme Court decision in *Cuyahoga*. Even if Defendant Olsen failed in his duty to advise the other Defendants of *Cuyahoga* specifically, and the violation the most basic principles of American democracy, freedom of speech, and popular sovereignty generally, the community in the contentious public debate that necessarily resulted served to remind the Defendants of the tyranny and unlawful acts they were contemplating. Defendants nevertheless knowingly continue the unlawful use of the administrative exception, under color of law, to violate the federally protected constitutional rights of Nolette and other Plaintiffs.

**II. Have Defendants Tobler and Walker Violated State Law Protections of the Public?**

Nevada statutes protects the public interest from abuse of self-interested public officials by its ethics laws, as generally provided in NRS 281A, 1. (b) and 3. (b). Defendants Tobler and Walker have a duty under to publicly disclose any pecuniary interest they may have in any matter coming before them, to abstain from advocating for or against them, and to abstain from voting on them. Such disclosure and abstentions serve to assure the public that their public officials are not acting in their own interest and not in the public interest.

Defendants Tobler and Walker have pecuniary interests, namely the value of their respective personal residences which are proximately situated to both of the City's golf courses, the possible closure of one may have resulted from passage of one of the initiatives. On or about August 10, 2010, Defendants Tobler and Walker failed to disclose their pecuniary interests during the Council consideration of the litigation commenced by the City Attorney; failed to abstain from advocating against that measure; and failed to abstain from voting against it.

The failure to comply with NRS 281A.420, Requirements regarding disclosure of conflicts of interest and abstention from voting because of certain types of conflicts; effect of abstention on quorum and voting requirements; exceptions, was the proximate cause of the continued litigation by the City Attorney against the golf course initiative that followed prior to the election. Had Defendants Walker and Tobler disclosed and abstained as required under Nevada's ethics law, the litigation would have ceased at least until after the November general election. As it turned out the litigation that took place between August and November concerned only the golf course, and would have been entirely unnecessary in that the voters rejected the golf course question. Nolette and other Plaintiffs suffered damages of emotional distress and legal and other expense in the course of the continued litigation.

## CONCLUSION

The core political speech of the voters have been chilled and their rights and powers of popular sovereignty have been crippled by the Defendants as a matter of City policy. Nolette and other Plaintiffs have suffered damages proximately caused by Defendants and are entitled to relief as provided by 42 USC Sections 1983 and 1988.

Dated this 9th day of August, 2012

NANCY A. NOLETTE
*Plaintiff in Pro Se*
216 Bighorn Drive, Unit 1
Boulder City, NV 89005